IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BRYCE EVERETT PETERSON,<br><br>Petitioner,<br><br>vs.<br><br>JIM SALMONSEN; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>Respondents. | Cause No. CV 17-19-M-DLC-JCL<br><br><br>FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |

This case comes before the Court on Petitioner Peterson's application for a writ of habeas corpus under 28 U.S.C. § 2254. Peterson is a state prisoner proceeding pro se.

Pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), Peterson pled guilty in Montana's Twenty-First Judicial District Court, Ravalli County, to aggravated kidnapping, aggravated assault, assault with a weapon, intimidation, aggravated burglary, and partner or family member assault. He is currently serving a sentence of 70 years in prison, with 20 of those years suspended. *See* Pet. (Doc. 1) at 3 ¶¶ 3–5; Judgment (Doc. 26-20) at 2–3 ¶¶ 2–8.

1

Many of Peterson's assertions appear significant.  After reviewing all of his submissions as well as the record of proceedings in state court, however, it is clear that Peterson knew everything he needed to know to enter voluntary, knowing, and intelligent *Alford* pleas to each one of the State's charges.  Peterson correctly asserts that the State misrepresented some information to the trial court.  Even so, the record conclusively shows that he suffered no prejudice, either to his ability to defend or at sentencing.

## I.  The State's Case

The following summary is not intended to establish the truth of what happened between Peterson and his sometime-girlfriend, Heather Portner, or inside Peterson's home.  It indicates what the State would have presented at trial and, therefore, the issues the defense had to be prepared to meet.[1]

Around 1:20 p.m. on Friday, October 17, 2008, Ravalli County dispatch received a 911 call from a resident of Victor, Montana, "Janet."  Janet reported she was with a woman, later identified as Portner, whom she had seen running down the street screaming while being pursued by a man in a pickup truck waving a gun.  Janet took shelter with Portner in a church.  *See* 1 Sentencing Tr. (Doc. 26-8) at

---

[1]  In some instances, the information described is presented as hearsay.  Had the case gone to trial, however, there is no reason to suppose the State could not have presented competent, non-hearsay testimony.

2

16:1–16:14.

Ravalli County Deputy Pease arrived at the church within two minutes of the 911 call. *See* Pretrial Mots. Hr'g Tr. (Doc. 26-5) at 52:9–52:21. He found Portner "distraught" and "scared." He described her as "still reacting as if somebody was going to come through me and the surrounding individuals, as well as the church walls in order to get to her." *Id.* at 54:6–54:13. Portner told Pease "Bryce Peterson was trying to kill her" and "had told her that he was going to kill her and then kill himself." She said Peterson had abducted her from her home that morning and intended to "make it appear as if she was suicidal." *Id.* at 55:6–55:15. Pease observed bruising to Portner's wrists, legs, and shoulder. *Id.* at 57:20–57:24. According to Pease, Portner said Peterson was "kicking me and kicking me. He was beating me and beating me." *Id.* at 59:9–59:21. She also said he "was punching me in the back of the head with a gun." *See* 1 Sentencing Tr. (Doc. 26-8) at 25:15–26:13.

For about two hours, Peterson's whereabouts were unknown. A truck that could have been his was seen leaving Victor at high speed. *See* 1 Sentencing Tr. (Doc. 26-8) at 22:12–23:1, 58:11-59:6. At about 3:00 p.m., Peterson was located at his home. *See id*. at 35:9–35:23. He was reported to be armed. About one officer, Peterson said "words to the effect that" if the officer "popped his head out

3

again" from behind his car, Peterson "would take him out."  *See id.* at 40:17–41:21.  More than 50 other residents were evacuated from the area.  *See id.* at 38:14–38:25.  After about 18 hours, Peterson surrendered.  *Id.* at 39:3–39:5.

A search of the house failed to turn up a handgun, though an officer noted no one had looked in the crawl space.  *See* 1 Sentencing Tr. (Doc. 26-8) at 56:14–56:22.  Six rifles, two shotguns, and ammunition were locked in a glass-front gun cabinet.  None of the items bore any prints, indicating they had been cleaned or wiped.  *Id.* at 45:10–47:2.  The keys to Peterson's truck and two cell phones were found in the cupboard under the kitchen sink, tucked behind the trash can. Peterson's current girlfriend's phone matched the number for one of the phones, 531-xxxx, to Peterson's name.  A text from "Bryce Peterson" to her phone said, "Before I go the guns will be put away and I will put the phones under the kitchen sink."  The message was sent about midway through the 18-hour standoff.  *See* 1 Sentencing Tr. (Doc. 26-8) at 49:11–54:11.

According to the affidavit the State filed in support of its charges, Portner and Peterson had planned to go together to Missoula to see their doctors on October 17.  That morning, Peterson canceled his appointment.  When he told Portner he had done so, Portner told Peterson not to contact her again.  Shortly after that, Peterson knocked on her door.  She told him to go away, but he broke

4

the doorjamb by kicking in the door.  Peterson attacked her and forced her out to his truck.  They began to drive toward Missoula.  Peterson called a nurse to report Portner had overdosed on her medication and was combative.  The nurse told him to call 911 and instructed him to take Portner to an emergency room.  *See* Aff. in Supp. of Information (Doc. 34-1) at 2–3.

Peterson did neither.  When Portner attempted to cry out, Peterson punched her.  He continued yelling questions at her and striking her.  He turned on to Highway 12, which leads not to a hospital but to wilderness.  Portner said Peterson told her he was taking her where no one would ever find her.  At one point, he turned onto a side road, pulled over, and asked her, "Is this a good place?"  *See id.* at 3.

Eventually, Peterson turned around and took Portner back to his residence in Victor.  Peterson pushed Portner inside, telling her, "I'm going to end this for both of us."  He held a handgun to his head and, when Portner looked away, slapped and hit her across her face.  At one point, Portner said, an officer approached the home, knocked, and announced himself.  Peterson pointed his gun in Portner's face and told her not to say "a word."  Hearing no response to his knock, the officer left. *See id.* at 3–4.

Peterson made several phone calls in the house.  He called his mother, told

5

her Portner had overdosed and struggled with him, and stated that he knew he would be arrested so he was "just going to let [Portner] die."  Portner ran out the back door when Peterson was distracted with another call.  *See* Aff. in Supp. of Information at 4.

After about 4:00 p.m. that afternoon, Portner went to the emergency room at St. Patrick's Hospital in Missoula with a friend of hers who had been expecting her since noon.  The friend, Hallie Eayrs, later testified that Portner had arranged to stay with her that weekend because she was "terrified" of Peterson.  *See* 1 Sentencing Tr. (Doc. 26-8) at 61:6–63:11.  Eayrs also said that Portner had stayed with her in Missoula about two weeks before the October 17 incident.  Peterson tracked Portner down and approached the two as Eayrs and Portner were standing on the front porch.  Eayrs told Peterson she "was going to call 911 and his response was how fast do you think they can get here?  And when he said that, he made a motion and showed me a black handgun in his waistband."  *See* 1 Sentencing Tr. (Doc. 26-8) at 65:12–66:14.  Peterson then entered Eayrs' house.  Eayrs said, "There was some yelling and some screaming, arguing, and then he took her by the arm and he dragged her out the front door."  *Id.* at 66:16–67:2.  Eayrs did not call 911.  On previous occasions, she said, she had seen Peterson abuse Portner verbally and emotionally but not physically.  Before the early October incident, she

had never seen Peterson with a gun.  *See id.* at  68:1–69:14.

A few days after the October 17 incident underlying the criminal charges, an officer observed and photographed bruising on Portner's left temple, her upper arms and wrists, thighs, and her left upper back and shoulder.  Portner also had a perforated eardrum and a concussion.  *See* 1 Sentencing Tr. (Doc. 26-8) at 29:22–32:13, 43:21–43:24; State's Sentencing Exs. (Doc. 26-10) at 8–23; State's Sentencing Exs. (Doc. 27-2) at 1–2 (filed under seal).

The State located a woman in Arizona who would testify to three incidents of Peterson's pursuit and physical abuse of her,  *see* 1 Sentencing Tr. (Doc. 26-8) at 75:1–100:6, and a police officer familiar with Peterson's statements and behavior on those occasions and with respect to his assaults on two other women as well.  All three of the Arizona women were current or former marital or dating partners.  Some incidents involved threats by Peterson to kill himself or to shoot at officers or provoke officers to shoot him.  *Id.* at 102:7–116:13.

Peterson pursued a "good Samaritan" defense.  He asserted that he went to Portner's home on October 17 because she had told him she ingested her entire bottle of lithium with the intention of killing herself.  In a pretrial interview with the defense, Portner agreed that when Peterson kicked in her door, he immediately asked where the lithium was.  She also agreed he tried to make her drink water

7

while she was with him that morning.  *See* 2 Sentencing Tr. (Doc. 26-9) at 17:9–

17:14, 20:21–21:7.[2]  According to Peterson, he did that because he had researched

the issue on the internet before going to Portner's house and determined it would

delay or counteract the effects of a lithium overdose.  He said he did not call 911

because he did not believe his call would be taken seriously.  (He did, however,

call Jackie, a friend of Portner's, leaving a message using words to the effect of

"something odd is going on and I'm scared for her [Portner], you need to check on

her."  *See* 2 Sentencing Tr. (Doc. 26-9) at 25:8–25:22; *see also* 10/17/2008 Report

(Doc. 27-6) at 614–15 (filed under seal)).  He explained his failure to take Portner

to an emergency room by averring that, while he and Portner were in the truck,

they decided to commit suicide together.  *See, e.g.*, 2 Sentencing Tr. (Doc. 26-9) at

54:17–116:15; *see also id*. at 131:17–132:22.

---

[2]  Portner also said the lithium was working for her.  *See* 2 Sentencing Tr. (Doc. 26-9) at 24:2–24:6.
    Peterson testified at sentencing that he believed that by ingesting lithium, Portner "had already pulled the trigger on a gun, only it was just a very slow acting bullet."  *Id.* at 80:18–23.  He believed her death would be "painful."  *Id.* at 81:1–7.  He said that "part of my reasoning" for "want[ing] to die" was "the day prior to that when [Portner] had broken up my only happiness I had going on" by causing Peterson's new girlfriend to break up with him.  Peterson said Portner "made sure that she destroyed that [happiness] that day."  *See id*. at 79:14–79:25.  He said he "intended to kill [him]self," *id.* at 91:4–91:7, and "never took a gun out" of the locked gun case and "didn't have a pistol" throughout the 18-hour standoff, *see id.* at 86:19–87:23, and also sent a text stating he would "put the guns away" before he left the house, *see* 1 Sentencing Tr. (Doc. 26-8) at 49:11–54:11.
    Again, the point here is not to determine the truth but merely to show that a reasonable juror might interpret the evidence differently than Peterson does.

8

## II.  Procedural Background

The State charged Peterson with aggravated kidnapping, a violation of Mont. Code Ann. § 45-5-303(1)(c) (2007); aggravated burglary, a violation of Mont. Code Ann. § 45-6-204(1) and (2)(b); aggravated assault, a violation of Mont. Code Ann. § 45-5-202(1); assault with a weapon, a violation of Mont. Code Ann. § 45-5-213(1)(b); intimidation, a violation of Mont. Code Ann. § 45-5-203(1)(a); and partner or family member assault, a violation of Mont. Code Ann. § 45-5-206(1)(a), (c), and (2)(b).  The intimidation charge arose from Peterson's threat against the officer during the standoff.  The other charges arose from Peterson's actions toward Portner.

After psychological evaluation, Peterson was found competent to stand trial and capable of acting purposely or knowingly at the time of the charged offenses. *See* Mont. Code Ann. §§ 46-14-102, -103 (2007).  Following a hearing on pretrial motions, the judge ruled the State would be permitted to introduce Portner's and the 911 caller's statements as excited utterances.  It also ruled that evidence of Peterson's crimes in Arizona was admissible to prove Peterson intended to harm Portner rather than help her.  *See* Mont. R. Evid. 803(2), 404(b); Pretrial Mots. Hr'g (Doc. 26-5) at 65:8–66:24; Trial Court Order at 10–11, 24 ¶¶ 1, 2(B) (Doc. 1-2 at 74–75, 88); *see also* Change of Plea Tr. (Doc. 26-7) at 22:6–23:15.

9

Peterson rejected a plea offer from the State, but, on September 10, 2009, the day before trial was scheduled to begin, he pled guilty without a plea agreement. He entered *Alford* pleas[3] to all counts—that is, he pled guilty because he believed the State would be able to prove its charges to a jury beyond reasonable doubt, not because he agreed he was guilty. *See* Change of Plea Tr. (Doc. 26-7) at 7:5–7:13, 14:19–15:14, 17:9–17:25, 18:22–19:8, 24:17–24:25. After a sentencing hearing spanning two days, Peterson was sentenced to serve a total of 70 years in prison, with 20 of those years suspended. Written judgment was entered on November 23, 2009. *See* Judgment (Doc. 26-20) at 1, 3 ¶ 8.

Peterson timely appealed. New counsel was appointed to represent him. Before the appeal was heard, Peterson decided to dismiss it and instead move the trial court to withdraw his *Alford* pleas. *See* Order at 1, *State v. Peterson*, No. DA 10-0034 (Mont. Oct. 19, 2010); Mot. to Dismiss & Aff. (Doc. 26-22) at 1, 3; Order (Doc. 26-23) at 1.[4]

On November 22, 2010, represented by a public defender, Peterson moved to withdraw his *Alford* pleas "for the reason that Peterson's mental state at the time

---

[3] *See Alford*, 400 U.S. at 31–39 (holding that States may allow accused to maintain his innocence while pleading guilty, provided the State has evidence to support the guilty plea).

[4] These and all other documents filed with the Montana Supreme Court are available from its website, https://supremecourtdocket.mt.gov (accessed June 26, 2019).

he entered his pleas precluded a knowing and voluntary entry of those pleas" and because "the Court's colloquy was insufficient to conclude the pleas were properly tendered or accepted."  Mot. to Withdraw Pleas (Doc. 26-24) at 1.  After an evidentiary hearing, the trial court denied the motion.  *See* Order Denying Mot. to Withdraw Pleas (Doc. 26-27) at 1.  Peterson timely appealed.  *See* Notice of Appeal (Doc. 26-28) at 1.  On November 5, 2013, the Montana Supreme Court affirmed the trial court but remanded the matter to the trial court to determine the amount of restitution Peterson owed the victim.  *See* Order (Doc. 26-33) at 1, 15–16 ¶ 42.  Rehearing was denied on December 18, 2013.  *See* Order (Doc. 26-36) at 1.  The trial court entered an amended judgment striking the restitution award on February 28, 2014.  *See* Am. Judgment (Doc. 26-40) at 5–6 ¶ 9(n); *see also id*. at 8.

On December 17, 2014, Peterson, acting *pro se*, filed a petition for postconviction relief.  *See* Postconviction Pet. (Doc. 26-43) at 1.  The trial court rejected the State's argument that the petition was untimely, *see* Order Denying Postconviction Pet. (Doc. 26-68) at 25–28, considered Peterson's claims on the merits, and denied them as well as numerous subordinate motions, *see id*. at 29–68.  Peterson timely appealed.  *See* Notice of Appeal (Doc. 26-69) at 1.

While the postconviction appeal was pending, Peterson filed two additional actions.  First, on November 7, 2016, Peterson petitioned the Montana Supreme

11

Court for a writ of habeas corpus, claiming that Portner had a sexual relationship with the trial judge in the fall of 2009—in the midst of the proceedings against Peterson.  Peterson claimed the trial judge should have recused himself.  Noting that Peterson was "only repeating" "[s]imilar accusations [that] surfaced in the local media during the recent race for District Court Judge in Ravalli County," the Montana Supreme Court found that Peterson "failed to carry his burden of persuasion to establish that his incarceration is illegal."  Order at 2, *Peterson v. Kirkegard*, No. OP 16-0668 (Mont. Nov. 22, 2016).  Rehearing was denied on December 28, 2016.  In that order, the court clarified that the writ of habeas corpus is not available under state law to challenge the validity of a conviction or sentence.  *See* Order at 1–2, *Peterson*, No. OP 16-0668 (Mont. Dec. 28, 2016); *see also* Mont. Code Ann. § 46-22-101 (2015).

Second, on February 17, 2017, Peterson filed a petition for writ of habeas corpus in this Court under 28 U.S.C. § 2254.  He moved for a stay pending the Montana Supreme Court's disposition of the pending postconviction appeal.  *See* Pet. (Doc. 1) at 1; Mot. to Stay (Doc. 7) at 1–2.  This Court granted the stay.  *See* Order (Doc. 10) at 3 ¶ 1.

On July 5, 2017, in Peterson's state postconviction appeal, the Montana Supreme Court ruled that Peterson's petition was untimely under state law, *see*

12

Mont. Code Ann. § 46-21-102, because it was filed more than a year after Peterson's conviction became final.  It affirmed the trial court's denial of relief on that basis, without considering the merits of Peterson's claims.  *See* Order (Doc. 26-85) at 1, 6 ¶ 13, 9–10 ¶ 21, *Peterson v. State*, No. DA 15-0773, 2017 MT 165 (Mont. July 5, 2017).

On July 17, 2017, the stay in this case was lifted.  On August 29, 2018, the State filed relevant documents from the state court record.  Peterson supplied additional documents.

### III.  Peterson's Claims

Peterson's federal petition asserts eight claims for relief:

A.    The government failed to disclose evidence favorable to the accused, violating Petitioner's right to a fair trial, confrontation, and due process as guaranteed by Amendments 5, 6, and 14 to the U.S. Constitution.  (*See* Pet. (Doc. 1) at 4–26.)

B.    The government failed to disclose "Brady" evidence that was in the possession of investigative agencies to which the government had access, violating Petitioner's right to due process, fair trial, counsel, and confrontation as guaranteed by Amendments 5, 6, and 14 to the United States Constitution. (*See* Pet. at 26–32.)

C.    The Prosecutors' misstatement of material facts was used to obtain Petitioner's conviction, violating Petitioner's right to due process, fair trial, confrontation, and counsel as guaranteed by Amendments 5, 6, and 14 of the United States Constitution. (*See* Pet. at 32–34.)

D.    Petitioner's trial counsel was ineffective because the lawyer performed deficiently and the deficiency prejudiced the outcome by forcing Petitioner to plead *Alford*, violating Petitioner's right to counsel, fair trial, confrontation and due process as guaranteed by Amendments 5, 6, and 14 of the United States Constitution.  (*See* Pet. at 34–36.)

E.    Motion-to-withdraw counsel prejudiced Petitioner by ignoring issues that were stronger than those presented, violating Petitioner's right to counsel, confrontation, fair trial, and due process as guaranteed by Amendments 5, 6, and 14 to the United States Constitution.  (*See* Pet. at 36–38.)

F.    Petitioner's Alford plea was not a knowing, intelligent, and voluntary choice because the government withheld material information from Petitioner's counsel, misrepresented evidence to the court that was not provided to the defense which induced the Petitioner to change his pleas to Alford.  This violated Petitioner's right against self-incrimination, right to a fair trial, compulsory process, confrontation, effective assistance of counsel, and due process as guaranteed by Amendments, 5, 6, and 14 to the United States Constitution.  (*See* Pet. at 38–41.)

G.    The State District Judge, Jeffrey Langton, presided over Petitioner's original criminal proceedings, withdrawal of plea proceedings, and post-conviction proceedings while having an ongoing sexual relationship with Heather Portner, the Petitioner's alleged victim.  This violated Petitioner's right to due process, impartial judge, fair trial, confrontation, effective assistance of counsel, self-incrimination, and compulsory process as guaranteed by Amendments 5, 6, and 14 to the United States Constitution.  (*See* Pet. at 41–43.)

H.    The Petitioner was denied his right to develop Ineffective Assistance of Counsel claims on the record during his initial-review collateral proceeding when the state post-conviction relief (PCR) court rescinded appointment of counsel, refused to allow discovery, joined the State in speculation about

14

evidentiary value and did not require a response from counsel
concerning the non-record based claims or conduct a hearing to
determine if the available evidence supported counsel's
defense of his client and would have proceeded to trial.
Furthermore, motion-to-withdraw counsel's performance was
subject to the same analysis, but refused by the PCR court.
This violated Petitioner's right to effective assistance of trial
counsel, compulsory process, confrontation, fair trial, and due
process as guaranteed by Amendments 5, 6, and 14 of the
United States Constitution.  (*See* Pet. at 43–47.)

For present purposes, the Court will condense these eight claims into three:

1.     Peterson's *Alford* pleas were involuntary because (a) the
       prosecution withheld material exculpatory and/or impeaching
       information and misrepresented material facts to deprive him of
       a trial defense, and (b) trial counsel's pretrial investigation and
       advice to avoid trial were unreasonable (Claims A, B, C, D, and
       F), and plea-withdrawal counsel was ineffective because he
       failed to assert these grounds as reason to withdraw the *Alford*
       pleas (Claim E).[5]

2.     The trial judge had a conflict of interest (Claim G).

3.     Peterson was denied due process in postconviction proceedings
       (Claim H).

## IV.  Analysis

Although it is possible Peterson's federal petition is untimely and one or

more claims are procedurally defaulted, those issues pose questions that need not

---

[5]  This order will use the terms "trial counsel" and "plea-withdrawal counsel."  Although
there was no trial, counsel was appointed to represent Peterson in the trial phase of the case.
Peterson's term "motion-to-withdraw counsel" may be confused with a different type of motion,
not involved here, involving an attorney's withdrawal from representation.

be answered.  *See, e.g.*, *Ayala v. Chappell*, 829 F.3d 1081, 1095–96 (9th Cir. 2016); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

### A.  Claims A–F

Most of Peterson's claims allege the State withheld evidence it was obligated to disclose or misrepresented evidence to the court to influence its view of the case.  He alleges the State withheld evidence concerning Portner's mental health history as well as evidence concerning his own prior interactions with and mistrust of law enforcement.  *See* Pet. (Doc. 1) at 4–24; *see also* Br. in Supp. (Doc. 2) at 8–23.

The State was required to disclose to Peterson exculpatory information relevant to guilt and/or punishment and information capable of impeaching the credibility of a prosecution witness, to the extent the information, considered with all the other evidence, realistically could support a reasonable juror's reasonable doubt.  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 434–35, 436–37 (1995); *United States v. Bagley*, 473 U.S. 667, 678, 682 (1985); *Giglio v. United States*, 405 U.S. 150, 153–55 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  State law might have required more of the prosecution than federal law, but a federal habeas court is concerned only with the requirements of federal law.  *See, e.g.*, *Wilson v. Corcoran*, 562 U.S. 1, 4–6 (2010).

16

### 1. Portner's Mental Health History

Peterson principally frames his allegations about evidence of Portner's mental health history as *Brady* claims. But they are better approached, at least initially, as *Napue* claims—that is, as claims the prosecution misrepresented evidence and failed to correct its statements. *See, e.g.*, Pet at 24–25 (citing *Napue v. Illinois*, 360 U.S. 264 (1959)); *see also Alcorta v. Texas*, 355 U.S. 28, 31–32 (1957) (per curiam). To summarize many pages of essentially repetitive allegations, Peterson asserts the State misrepresented the evidence to the trial judge to influence his ruling on Peterson's motion to subpoena Portner's medical records and so deprived him of evidence supporting his defense.

### a. What the State Represented to the Trial Judge

At the pretrial motions hearing, Peterson argued that Portner's records "would buttress the Defense's position that Mr. Peterson had adequate reason to believe that this was another suicide attempt or claimed suicide attempt, and, therefore, buttress Mr. Peterson's specific defense that he was at her residence on that day for a specific reason." Pretrial Mots. Hr'g Tr. (Doc. 26-5) at 79:14–79:19. In opposition to the motion, the State said:

> [I]n early September there was one call from a friend of Miss Portner about her state of depression. Miss Portner has never denied that she's struggled with depression, that she's sought mental health for that. Deputies responded. It was something that was handled without

17

a—without taking her in to help her, no hospitalization, nothing.  It was handled with a friend taking her home.

        The second one that the Defendant points to was a call made by the Defendant himself in which he's the only one who used the word 'suicide.'  Miss Portner was checked on by Sergeant Hudson at 4:00 in the morning, clearly was fine.  He left her.  There was no issue.

        And the third one is the day of this incident, when a welfare check that Deputy Pease responded to was called in, specifically not about suicide, but, in fact, about concerns about Mr. Peterson and Miss Portner, was the subject of that call.

        So I realize Mr. Peterson wants it to be that this lady has a history of suicide attempts, but that's not the fact and there's no facts to support that and they are asking for this invasion into her seeking mental health help for depression.  She's been very candid about that.  She's tried different medications and so forth to concur [sic] it.  They want to invade that under this guise of she's suicidal and it's just not—there's no factual support there.

Pretrial Mots. Hr'g (Doc. 26-5) at 80:9–81:11.

### b.  What the State Left Out

At the change of plea hearing, Peterson personally voiced his objection to

the State's representation at the pretrial motions hearing.  He said:

> [The State] sat here and told you, Your Honor, that the only person mentioning suicide was Mr. Peterson and they failed to leave out [sic] the very following day, on one of the suicide allegations, that Officer Hudson had called Heather Portner and she was on her way to the hospital, as well as on the October 6th she had committed—overdosed and tried to attempt suicide.

Change of Plea Tr. (Doc. 26-7) at 17:17–17:24.

Peterson correctly identified omissions by the State at the pretrial motions

hearing.  The State knew Sergeant Hudson followed up with Portner the day after

18

the second incident it mentioned, on September 24, 2008, and learned that she was

on her way to Missoula to obtain mental health services, yet it failed to tell the trial

judge about it. *See* Report 9/23/2008 (Doc. 1-2 at 29–30, 37–39).

More egregiously, the State also omitted altogether an incident on October 6,

2008, when Portner's ex-mother-in-law, Karen, reported that Portner might be

suicidal. Deputy Hochhalter responded to the call and spoke with Portner. He

found her incoherent and requested EMS assistance. Portner said she took some of

her pills but did not know how many. She denied taking them to harm herself.

EMS personnel found two empty bottles of Lorazepam and transported Portner to

the hospital in Missoula. *See* Report 10/6/2008 (Doc. 1-2 at 40–41). Although it is

not clear how many pills Portner took, this incident strongly appeared to be a

suicide attempt, not merely suicidal ideation, and it occurred just 11 days before

the events at issue.

Based on the information in the record, it is troubling the State omitted this

incident. It possessed information about it, as there was a police report concerning

the event,[6] *see* Report 10/6/2008 (Doc. 102 at 40–41), and the State had a

constitutional obligation to make itself aware of such evidence, *see, e.g.*, *Kyles*,

---

[6] Peterson asserts he did not receive the police report concerning the October 6 incident until September 2014. *See* Pet. at 12 ¶ 5 (Doc. 1-2 at 40–41) (referring, *inter alia*, to Ex. 4.3). The Court assumes that is true.

19

514 U.S. at 438 (citing *Giglio*, 405 U.S. at 154).  The October 6 incident was

directly relevant and directly contrary to the State's response to Peterson's motion.

The State should have told the trial judge about it.  By failing to do so, the State

distorted the trial judge's picture of the likelihood Portner attempted suicide on

October 17 and the potential weight of Peterson's purported belief that she might

have.

### c.  Did the State's Omission Prejudice Peterson?

Even so, neither the State's omission nor its failure to disclose the police

report had any real impact on Peterson's case.

First, the trial court did not rule that evidence of Portner's suicidal ideation

or attempts would be inadmissible at trial.  It simply denied Peterson's request to

subpoena her medical and mental health records from Missoula and admit them

into evidence at trial or review them *in camera*.  The trial court held, in part, that

Peterson had not shown "a factual basis for the victim's suicide attempts."  This

aspect of its decision certainly was influenced, indeed virtually determined, by the

State's omission.  But the trial court also held that Peterson's request "invades the

privacy of the victim" and that he had not shown "the victim's medical and mental

health records are relevant."[7]  Trial Court Order re: Pretrial Mots. at 21–22 (Doc.

---

[7] "Relevant" evidence is evidence that makes a fact at issue more likely or less likely to

1-2 at 85–86).  These two aspects of the trial court's decision were not affected by the State's error.  Peterson still has not shown why Portner's *medical and mental health records* were relevant.  And denying access to such sensitive information about a victim of a crime was a wholly unremarkable conclusion for the trial court to reach.

Likewise, the trial court denied admission of Peterson's *own* mental health records on the grounds that he had not adequately shown a mental disease or defect prevented him from acting purposely or knowingly in the course of the October 17 events.  *See* Trial Court Order re: Pretrial Mots. at 14–15, 16 ¶¶ 3–4, 17–18 ¶ 5 (Doc. 1-2 at 78–79, 80, 81–82).  This decision was consistent with Montana law. *See* Mont. Code Ann. § 46-14-217 (2007).  And just as the trial court's ruling did not preclude Peterson from introducing at trial evidence of Portner's conduct or statements on or before October 16–18, 2008, or of Peterson's volatile relationship with her, it also did not preclude him from introducing evidence of his own thoughts or feelings or intentions at the time of the crimes.

Nor did the trial court's refusal to admit, review, or subpoena Portner's records prevent Peterson from proving or disputing any material fact.  As Peterson himself said, "[n]ot even two weeks prior" to the October 17 incident, he "received

---

be true.  *See* Mont. R. Evid. 401.

a call" he would "never forget" from "Dr. Felix at St. Pat's," telling him that

Portner "had almost killed [her]self by overdose." 2 Sentencing Tr. (Doc. 26-9) at

132:10–132:14; *see also, e.g.*, Standoff Tr. at 23 ll. 446–452 (Doc. 1-4 at 97). This

was the October 6 incident. Peterson clearly knew about it, as his reference to it at

the change of plea hearing necessarily proves. And, had he gone to trial, he would

not have been the only person who could testify about the incident. Peterson knew

Jackie, Portner's "new roommate," and knew they met because Portner sought

mental health treatment following the October 6 incident. *See* 2 Sentencing Tr.

(Doc. 26-9) at 74:16–75:15. Peterson knew Karen and Lindy, two other friends of

Portner who were familiar with her history, including the October 6 incident. *See*

*id.* at 70:6–70:21; *see also, e.g.*, PCR Peterson Aff. at 11, 21 (Doc. 1-3 at 78, 88).

Peterson could have called and examined any of these people—Dr. Felix, Jackie,

Karen, Lindy, and Portner herself— as witnesses at trial. Police reports are not

evidence; witness testimony is.

Peterson also had ample evidence available to him to show the nature of his

and Portner's history and interaction with each other. Peterson's investigator said

"everyone that we interviewed knew of their relationship and the dynamics, at least

it seemed that way to me." 2 Sentencing Tr. (Doc. 26-9) at 14:5–14:7. The trial

court acknowledged that cell phone records showing Portner making dozens of

calls to Peterson on October 16 through 18, 2008, were relevant and admissible upon proper foundation.  The same was true of numerous text messages, including the ones Peterson relied on at sentencing.  *See* Trial Court Order re: Pretrial Mots. at 20–21 (Doc. 1-2 at 84–85); 2 Sentencing Tr. (Doc. 26-9) at 69:14–72:17.  The State agreed Portner had a history of depression; it agreed that officers had checked on her and friends had been concerned about her on more than one occasion; and it agreed that she was actively engaged in mental health treatment.  *See, e.g.*, Mot. Hr'g Tr. (Doc. 26-5) at 78:16–81:11.  Assuming Peterson testified that he was concerned Portner was suicidal on October 17, a jury would undoubtedly recognize that his statement was firmly rooted in Portner's past.

Further, Peterson's argument is something of a non sequitur.  More evidence of Portner's mental health history would not make it more likely he intended to help her on October 17.  *See* Mont. R. Evid. 401.  Had the case gone to trial, a jury would have balanced the uncontested fact of Portner's mental health issues and Peterson's testimony that he meant to rescue her against all the other evidence in the case.  Portner likely would have testified to a different account of events than Peterson.  She, Janet, and Deputy Pease would have testified about the alarming circumstances in which the incident came to light.  Evidence of Portner's injuries as well as her demeanor and excited utterances to Janet and Deputy Pease would

23

have been admitted. Eayrs would have testified that Peterson pursued Portner to Missoula, carried a gun, and made her leave Eayrs' house with him about two weeks before the October 17 incident. (Notably, this incident occurred shortly before Portner's apparent lorazepam overdose on October 6.) Victims and police would have testified about Peterson's similar crimes in Arizona. Peterson's position would have been undermined by the circumstances suggesting he attempted to destroy or conceal evidence by wiping and putting away the guns, by hiding the keys to the truck that could have been the one pursuing Portner as she ran down the street in Victor, and by hiding the phone with a text message saying that is what he planned to do. It is not remotely likely that more information about Portner's mental health or her volatile relationship with Peterson would alter the picture this evidence would paint for a reasonable juror.

The Court has also considered whether the State's omission affected Peterson's sentence. But the trial judge knew Peterson was not the only person who had expressed concern that Portner might be suicidal. *See, e.g.*, 2 Sentencing Tr. (Doc. 26-9) at 12:3–14:1. The judge knew that Portner had "self-admitted herself" for mental health treatment "on four occasions" for multiple days. *See id.* at 15:5–15:25. The judge also heard testimony that, in Peterson's view, proved he and Portner could not have been at his residence when Deputy Hudson knocked on

24

the door.  *See id*. at 30:9–33:5.

The trial judge did not view any of this information in the way Peterson hoped.  Struck by the similarity of the Arizona offenses, he said, "Obviously, the victim did have some mental issues that probably predate her relationship with you. . . . You do seem to seek out women who are troubled and become entwined with them," and these relationships "all seem to end badly for the women."  2 Sentencing Tr. (Doc. 26-9) at 140:14–140:19.  The judge perceived "an increasing pattern of increasingly violent behavior towards women and manipulation and using women for your own ends, and when either you are rejected or the women finally do something to assert their independence . . . all hell breaks loose."  *Id.* at 145:5–145:10.  The judge imposed a lengthy prison sentence because "if you are given additional chances to be out in the community . . . we'll just see this same thing again, only probably more violent and possibly with more serious injuries or death resulting to the woman that has the misfortune to become involved with you."  *Id.* at 145:10–145:15.  There is no reason to suppose the sentence would have been more lenient if the State had corrected its statements.

### d.  Conclusion

The State should have corrected its statements to the trial judge, but its error did not affect the trial judge's ultimate ruling about Portner's medical and mental

25

health records, did not undermine Peterson's ability to mount a defense, and did not contribute to the sentence. Additional police reports, recordings, and pictures, *see* Pet. at 26–30 ¶ B, may have been marginally "relevant," but they were not "material," *id.* at 30 ¶ 12. The Constitution does not require the State to disclose evidence that, considered together with all the incriminating, impeaching, and exculpatory evidence in the case, realistically would *not* alter a reasonable juror's view of the case. Even assuming all of Peterson's allegations in his federal petition are true, he cannot show the State's omissions were material or that the State withheld material evidence. He cannot show prejudice under *Napue* or *Brady*.

Peterson makes two claims of ineffective assistance of counsel that are derivative of his *Napue/Brady* claims. He asserts that trial counsel was ineffective because he failed to obtain the information in question, and plea-withdrawal counsel was ineffective because he failed to raise these claims in the motion to withdraw Peterson's *Alford* pleas. The Court will assume, for the sake of argument, that both counsel failed to pursue these matters and that their failure was unreasonable. Even so, Peterson must show he was prejudiced by them. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

The standard for showing the materiality of a *Napue* or *Brady* violation is similar to the standard for showing prejudice under *Strickland*. *See, e.g.*, *Kyles*,

26

514 U.S. at 434; *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Here,

immateriality under *Napue* and *Brady* also means lack of prejudice under

*Strickland*.  There is no reasonable probability a reasonable person in Peterson's

position would have chosen to go to trial rather than pleading guilty if trial counsel

had obtained the October 6 police report and Portner's medical and mental health

records.  That information made no difference in the defense's ability to present its

case or contest the State's evidence on any count.  Therefore, there is no reason to

suppose a reasonable defendant would have calculated his chances at trial

differently and reached a different decision but for the State's error.  In fact, there

is not even a reasonable probability that Peterson *personally* would have chosen to

go to trial if he had obtained Portner's medical and mental health records.  The

criminal trial was never going to be an opportunity to litigate the meaning of every

prior interaction or text message between Peterson and Portner, and that is what

Peterson seeks.  *See, e.g.*, PCR Peterson Aff. at 1–26 (Doc. 26-43 at 242–67)

(explaining events occurring before October 17, 2008).  Concomitantly, plea-

withdrawal counsel did not prejudice Peterson by failing to raise *Napue*/*Brady*

claims in the motion to withdraw Peterson's *Alford* pleas.

      All claims consisting of or derived from Peterson's allegations of *Brady* and

*Napue* violations, *see* Pet. at 7 ¶ 5(a)–(f); 8–10 ¶¶ 7–8, 9(h), 10–13; 10–13 ¶¶

27

14(a)–16; 20 ¶ 22(b)–(c), (e); 32–33 ¶ C; 34–35 ¶¶ 1–3; 36–37 ¶ E; 38–39 ¶ F,

should be denied for lack of merit.

## 2. Peterson's Prior Experiences with Law Enforcement

Evidence about Heather's mental health history is Peterson's primary

concern, but he also alleges the State unlawfully withheld evidence concerning his

own prior experiences with law enforcement.  Because Peterson's prior

experiences were not relevant to any of the crimes charged against him, the State

had no obligation to disclose such information.

### a. Intimidation

To convict Peterson of intimidation, the State had to prove, beyond

reasonable doubt:

1.    he acted with the purpose of causing law enforcement officers not to
      arrest him;

2.    he acted without lawful authority;

3.    he communicated to officers and dispatchers a threat to inflict
      physical harm with a handgun; and

4.    he acted under circumstances that reasonably tended to produce a fear
      that the threat would be carried out.

*See*  Mont. Code Ann. § 45-5-203(1)(a) (2007); Information (Doc. 34-2) at 3;

Change of Plea Tr. at 8:9-24.

Evidence of Peterson's prior experiences with law enforcement would not

28

negate any of these elements.  In fact, it might support the first and third.  There is

no reason to suppose Peterson's experiences would undermine the credibility of the

witnesses to this crime.  Again, they might instead support the prosecution

witnesses' credibility.  Nor would such evidence constitute or support a legally

cognizable defense:

> A person is not authorized to use force to resist an arrest which he
> knows is being made either by a peace officer or by a private person
> summoned and directed by a peace officer to make the arrest, even if
> he believes that the arrest is unlawful and the arrest in fact is unlawful.

Mont. Code Ann. § 45-3-108 (2007).

### b.  Other Five Offenses

Peterson's experience with law enforcement could not explain why Peterson

failed to take Portner to an emergency room.  Peterson does not identify any other

point on which his prior interactions with law enforcement might have been

relevant.

### c.  Conclusion

Evidence of Peterson's prior interactions with law enforcement was not

exculpatory with respect to any of the six offenses charged against him.  It was not

relevant to impeach a witness.  It did not support a defense.  The State had no

constitutional obligation to disclose it.  This portion of Peterson's claim, *see* Pet.

(Doc. 1) at 4 ¶ 3(a)–6 ¶ 4(j), should be denied.

### B.  Claim G

Peterson claims the trial judge should have recused himself because he had a sexual relationship with Portner at the time Peterson's case was being prosecuted. In support of this allegation, he has submitted three affidavits.  One affiant averred he twice heard Portner say she had a sexual relationship with the trial judge.  *See* R. Farmer Aff. at 1 ¶ 7, 2 ¶ 11 (Doc. 1-4 at 35–36).  Portner's alleged statements were made out of court, and Peterson offers them to prove the truth of the matter asserted.  They are hearsay.  *See* Mont. R. Evid. 801(c).  The same is true of the Lisa Farmer and French affidavits.  *See* L. Farmer Aff. at 4–5 ¶¶ 40–53 (Doc. 16-1 at 95–97); French Aff. at 3 ¶¶ 46–58 (Doc. 16-1 at 83).  Portions of the Lisa Farmer and French affidavits attempt to impeach Portner's testimony at a hearing held by the Commission on Practice.  Portner's testimony was given in July 2017 as the Commission was deciding whether attorney Robert C. Myers should be disciplined for recklessly disregarding the truth in campaign ads he sponsored when he was running against the trial judge in 2016.  It is worth pointing out that Myers presented no evidence tending to show the truth of the statements he sponsored, including the allegation that the trial judge had a sexual relationship with Portner.  Facebook posts, messages, and links are not competent evidence of who posted, sent, or linked them.

Peterson's exhibits are persuasive evidence of two facts:  first, both Portner and the trial judge have testified under oath that they did not have a sexual relationship, and second, no one has provided competent, non-hearsay evidence otherwise.  Peterson's allegations are based on affidavits that do not support a reasonable inference in favor of this claim.  It should be denied.

## C.  Claim H

Peterson claims he was denied a fair opportunity to develop his claims of ineffective assistance of trial and plea-withdrawal counsel in the course of the postconviction proceedings in state court.  He contends he was deprived of counsel, discovery, and a hearing.

Peterson was not entitled to be represented by counsel in postconviction proceedings.  *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1985).  Further, in a detailed, 70-page order, the trial court conscientiously considered Peterson's claims as well as whether he should receive discovery or a hearing.  At any rate, counsel, discovery, and a hearing would not have advanced Peterson's cause, because the Montana Supreme Court held Peterson filed his postconviction petition too late.

Peterson was not deprived of due process in the postconviction proceedings.  This claim should be denied.

### D. Other Allegations

The following allegations do not appear to fit under Peterson's headings for them, so it is not clear whether he intends to present them or considers them background information. At any rate, none support further proceedings.

Peterson alleges his *Alford* pleas, entered on September 10, 2009, were involuntary. He points out that trial counsel asserted Peterson was not competent on August 25, *see* Pretrial Mots. Hr'g Tr. (Doc. 26-5) at 4:19–6:8, 35 ¶ 4, but on September 10, trial counsel changed his opinion, even though "[t]here were no changes to Petitioner's environment or medication." *See* Pet. at 13 ¶ 17(b). But the trial court denied a continuance to allow trial counsel to develop a case that Peterson had become incompetent in the two months or so that had passed since his last evaluation. *See* Trial Court Order re: Pretrial Mots. at 4–5 (Doc. 1-2 at 68–69). Trial counsel had no choice but to change his opinion. Counsel cannot stay on the island after the ship has sailed.

Peterson also alleges that his pleas were involuntary because he did not have police reports from September 9 and September 23, 2008. *See* Pet. at 13–14 ¶ 17, 15–16 ¶ 20. Peterson knew about the incidents. He did not require the police reports, which, again, are not evidence.

Peterson alleges his plea to intimidation lacked adequate factual support to

show he intended to prevent the officers from performing an act. *See* Pet. at 14–15 ¶ 18; Mont. Code Ann. § 45-5-203(1)(a) (2007). Peterson's threat, together with the fact of the standoff, amply supports the State's contention that Peterson acted "with the purpose to cause Law Enforcement Officers to not perform an arrest." *See* Information (Doc. 34-2) at 3; Aff. in Supp. of Information (Doc. 34-1) at 4–5.

Peterson alleges he could not have committed assault with a weapon because he and Portner could not have been at his residence when Deputy Hudson knocked on the door, and no handgun was ever found. *See* Pet. at 15 ¶ 19. Connecting driving times and destinations in a logical and conservative way, Peterson's father concluded that Peterson and Portner would have returned to Peterson's home 40 or 50 minutes after the time the deputy's records showed he knocked on the door. *See* 2 Sentencing Tr. (Doc. 26-9) at 30:9–33:5. But his finding depended on the participants' statements about what time they left Portner's house, where they went, how fast or slow, whether they stopped, when, and for how long before they went to Peterson's house. Any underlying fact could be inaccurate at any point. Portner stated that she heard a deputy come to the door, knock, and identify himself. *See* 2 Sentencing Tr. (Doc. 26-9) at 25:23–26:1, 27:4–27:20. An officer testified the house was searched but the crawl space was not. *See* 1 Sentencing Tr. (Doc. 26-8) at 56:17–56:22. In combination with all the other evidence in the case,

this evidence is sufficient to support a reasonable juror's finding beyond reasonable doubt that the event occurred.

The allegations at pages 16 through 24, ¶¶ 21–22(s), neither demonstrate nor allege that Peterson was unaware of facts central to his choice to plead guilty.

To the extent these allegations attempt to state a claim for relief, all should be denied.

### V.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Despite his voluminous submissions and allegations, Peterson fails to identify any material fact of which he was not aware before he entered his *Alford* pleas.  He also fails to identify any material fact he would have been unable to

prove or negate at trial because of the State's alleged withholding of information. He knew what he needed to know before he entered his *Alford* pleas, and, although the State appears to have misstated significant facts about Portner's history to the trial court, there is no reason to suppose Peterson's sentence would have been more lenient had the State corrected its statements.  Peterson's allegations of *Napue* and *Brady* violations have no substance to them.  A certificate of appealability is not warranted.

Peterson's claim that the trial judge should have recused himself is based on third parties' hearsay allegations about the victim and the trial judge.  There is no reason to suppose the allegation may be true.  Peterson's claim that he was deprived of due process in state postconviction proceedings is unsupported by the law.  He also suffered no prejudice, because the Montana Supreme Court decided his postconviction petition was untimely.

Peterson presents no open questions and nothing on which reasonable jurists could disagree.  A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Peterson's petition (Doc. 1) should be DENIED.

2. The Clerk of Court should be directed to enter by separate document a

35

judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

**NOTICE OF RIGHT TO OBJECT**
**TO FINDINGS & RECOMMENDATION**
**AND CONSEQUENCES OF FAILURE TO OBJECT**

The parties may object to this Findings and Recommendation within 14

days.[8] 28 U.S.C. § 636(b)(1).  Failure to timely file written objections may bar a de

novo determination by the district judge and/or waive the right to appeal.

DATED this 27th day of June, 2019.

*/s/ Jeremiah C. Lynch*
Jeremiah C. Lynch
United States Magistrate Judge

---

[8]  As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.