IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BRYCE EVERETT PETERSON, | Cause No. CV 17-19-M-DLC |
| Petitioner, | |
| vs. | ORDER |
| ATTORNEY GENERAL OF THE STATE OF MONTANA, et al., | |
| Respondents. | |

## I. Background

This matter comes before the Court on remand from the Ninth Circuit Court of Appeals.  Petitioner Peterson, represented by appointed counsel, is a state prisoner seeking a writ of habeas corpus under 28 U.S.C. § 2254.

Peterson pled guilty in Montana's Twenty-First Judicial District Court, Ravalli County, to aggravated kidnapping, aggravated assault, assault with a weapon, intimidation, aggravated burglary, and partner or family member assault. He is currently serving a sentence of 70 years in prison, with 20 of those years suspended.  *See* Pet. (Doc. 1) at 3 ¶¶ 3–5; Judgment (Doc. 26-20) at 2–3 ¶¶ 2–8.[1]

---

[1]  Peterson entered an *Alford* plea.  *See North Carolina v. Alford*, 400 U.S. 25 (1970). *Alford* holds that a court may accept a defendant's knowing, voluntary, and intelligent guilty plea, even if the defendant maintains his innocence.  Likewise, a defendant who pleads no-contest does not expressly admit his guilt.  *See* 400 U.S. at 34–38.  Neither an *Alford* nor a no-

Peterson filed a habeas petition in this Court on February 17, 2017. The federal case was stayed while Peterson exhausted state remedies. On June 27, 2019, United States Magistrate Judge Jeremiah C. Lynch entered Findings and Recommendation. Addressing all of Peterson's claim on the merits, he recommended denying relief. *See* Findings and Recommendation (Doc. 35). Both parties objected. On October 19, 2019, this Court denied all of Peterson's claims as time-barred. *See* Order (Doc. 48). On appeal, the Ninth Circuit held that one of the claims, alleging judicial bias, was not time-barred and remanded for further proceedings. *See* 9th Cir. Mem. (Doc. 61).

Peterson now moves to amend his petition. He also requests leave to conduct discovery. One of the discovery requests, his motion for leave to depose trial counsel, relates to the motion to amend the petition. The other discovery requests relate to the judicial bias claim.

## II. Motions to Amend Petition and Depose Trial Counsel

### A. Legal Standards Governing Amendment

The Federal Rules of Civil Procedure apply in a habeas action unless they are "inconsistent with any statutory provisions" or with the Rules Governing Section 2254 Cases. *See* Rule 12, Rules Governing Section 2254 Cases; *Mayle v.*

---

contest plea indicates any claim or sense of wrongfulness in the conviction. Defendants who enter such pleas have the same legal status as defendants who admit their guilt.

2

*Felix*, 545 U.S. 644, 654–55 (2005).

Peterson argues that he is entitled to amend his petition without leave, pursuant to Fed. R. Civ. P. 15(a)(1).  The State was required to file documents from the state court record, *see* Order (Doc. 22), but has not been required to file an answer, *see* Rule 5, Rules Governing § 2254 Cases.  He may be right.  But if leave is required, the standard is a low one.  A court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam).  This policy is "to be applied with extreme liberality."  *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1173 (9th Cir. 2017) (internal quotation marks and citation omitted).

Still, "a district court need not grant leave to amend where the amendment . . . is futile."  *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citations omitted); *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).  And amendment is futile if the proposed new claims would be time-barred.  *See, e.g.*, *Clabo v. Johnson & Johnson Health Care Sys., Inc.*, 982 F.3d 989, 995 (6th Cir. 2020); *Bondurant v. City of Battle Ground*, 698 Fed. Appx. 361, 362–63 (9th Cir. 2017 (unpublished mem. disp.).  Similarly, if the claims are time-barred, they must be dismissed even if Peterson is entitled to add them to his petition.

For these reasons, the amendment issue is something of a red herring. Peterson's new claims include allegations that he has evidence—some new, some not so new—proving he is actually innocent.  Actual innocence excuses noncompliance with the limitations period.  *See* Reply (Doc. 80) at 5; *McQuiggin v. Perkins*, 569 U.S. 383, 387 (2013).  Whether he is said to adduce new claims for relief or only new evidence, if Peterson shows he is actually innocent, then the gateway is open to *all* of his claims, including the claims in the original petition. But if Peterson is not actually innocent, then his original claims remain time-barred, any new claims would also be time-barred, amendment would be futile, and only the judicial bias claim would remain for resolution.

To show actual innocence, Peterson must persuade the Court that, "in light of . . . new evidence"—that is, evidence not presented in the course of litigating the criminal case—"no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

## B.  Summary of the State's Evidence

Although Peterson pled guilty, both parties presented a considerable amount of evidence in pretrial motion hearings and at the two-day sentencing hearing. When United States Magistrate Judge Jeremiah Lynch issued Findings and Recommendation regarding Peterson's federal petition in 2019, he summarized this evidence.  As he noted, the summary "is not intended to establish the truth of

4

what happened between Peterson and his sometime-girlfriend, Heather Portner, or inside Peterson's home." Findings and Recommendation (Doc. 35) at 2. It "indicates what the State would have presented at trial and, therefore, the issues the defense had to be prepared to meet."[2] *See id*. The summary provides necessary context for Peterson's claims of actual innocence.

Around 1:20 p.m. on Friday, October 17, 2008, Ravalli County dispatch received a 911 call from "Janet," a resident of Victor, Montana. Janet reported she was with a woman, later identified as Portner, whom she had seen running down the street. Portner or Janet said Portner was being pursued by a man in a pickup truck waving a gun. Janet took shelter with Portner in a church. *See* 1 Sentencing Tr. (Doc. 26-8) at 16:1–16:14.

Ravalli County Deputy Pease arrived at the church within two minutes of the 911 call. *See* Pretrial Mots. Hr'g Tr. (Doc. 26-5) at 52:9–52:21. He found Portner "distraught" and "scared." He described her as "still reacting as if somebody was going to come through me and the surrounding individuals, as well as the church walls in order to get to her." *Id*. at 54:6–54:13. Portner told Pease "Bryce Peterson was trying to kill her" and "had told her that he was going to kill her and then kill

---

[2] In some instances, the information described is presented as hearsay. Had the case gone to trial, however, there is no reason to suppose the State could not have presented competent, non-hearsay testimony.

himself." She said Peterson had abducted her from her home that morning and intended to "make it appear as if she was suicidal." *Id.* at 55:6–55:15. Pease observed bruising to Portner's wrists, legs, and shoulder. *Id.* at 57:20–57:24. According to Pease, Portner said Peterson was "kicking me and kicking me. He was beating me and beating me." *Id.* at 59:9–59:21. She also said he "was punching me in the back of the head with a gun." *See* 1 Sentencing Tr. (Doc. 26-8) at 25:15–26:13.

For about two hours, Peterson's whereabouts were unknown. A truck that could have been his was seen leaving Victor at high speed. *See* 1 Sentencing Tr. (Doc. 26-8) at 22:12–23:1, 58:11-59:6. At about 3:00 p.m., Peterson was located at his home. *See id.* at 35:9–35:23. He was reported to be armed. About one officer, Peterson said "words to the effect that" if the officer "popped his head out again" from behind his car, Peterson "would take him out." *See id.* at 40:17–41:21. More than 50 other residents were evacuated from the area. *See id.* at 38:14–38:25. After about 18 hours, Peterson surrendered. *Id.* at 39:3–39:5.

A search of the house failed to turn up a handgun, though an officer noted no one had looked in the crawl space. *See* 1 Sentencing Tr. (Doc. 26-8) at 56:14–56:22. Six rifles, two shotguns, and ammunition were locked in a glass-front gun cabinet. None of the items bore any prints, indicating they had been cleaned or wiped. *Id.* at 45:10–47:2. The keys to Peterson's truck and two cell phones were

6

found in the cupboard under the kitchen sink, tucked behind the trash can. Peterson's current girlfriend's phone matched the number for one of the phones to Peterson's name. A text from "Bryce Peterson" to her phone said, "Before I go the guns will be put away and I will put the phones under the kitchen sink." The message was sent about midway through the 18-hour standoff. *See* 1 Sentencing Tr. (Doc. 26-8) at 49:11–54:11.

According to the affidavit the State filed in support of its charges, Portner and Peterson had planned to go together to Missoula to see their doctors on October 17. That morning, Peterson canceled his appointment. When he told Portner he had done so, Portner told Peterson not to contact her again. Shortly after that, Peterson knocked on her door. She told him to go away, but he broke the doorjamb by kicking in the door. Peterson attacked her and forced her out to his truck. They began to drive toward Missoula. Peterson called a nurse to report Portner had overdosed on her medication and was combative. The nurse told him to call 911 and instructed him to take Portner to an emergency room. *See* Aff. in Supp. of Information (Doc. 34-1) at 2–3.

Peterson did neither. When Portner attempted to cry out, Peterson punched her. He continued yelling questions at her and striking her. He turned on to Highway 12, which leads not to a hospital but to wilderness. Portner said Peterson told her he was taking her where no one would ever find her. At one point, he

7

turned onto a side road, pulled over, and asked her, "Is this a good place?"  *See id.*
at 3.

Eventually, Peterson turned around and took Portner back to his residence in
Victor.  Peterson pushed Portner inside, telling her, "I'm going to end this for both
of us."  He held a handgun to his head and, when Portner looked away, slapped and
hit her across her face.  At one point, Portner said, an officer approached the home,
knocked, and announced himself.  Peterson pointed his gun in Portner's face and
told her not to say "a word."  Hearing no response to his knock, the officer left.
*See id.* at 3–4.

Peterson made several phone calls in the house.  He called his mother, told
her Portner had overdosed and struggled with him, and stated that he knew he
would be arrested so he was "just going to let [Portner] die."  Portner ran out the
back door when Peterson was distracted with another call.  *See* Aff. in Supp. of
Information at 4.

After about 4:00 p.m. that afternoon, Portner went to the emergency room at
St. Patrick's Hospital in Missoula with a friend of hers who had been expecting her
since noon.  The friend, Hallie Eayrs, later testified that Portner had arranged to
stay with her that weekend because she was "terrified" of Peterson.  *See* 1
Sentencing Tr. (Doc. 26-8) at 61:6–63:11.  Eayrs also said that Portner had stayed
with her in Missoula about two weeks before the October 17 incident.  Peterson

8

tracked Portner down and approached as Eayrs and Portner were standing on the front porch. Eayrs told Peterson she "was going to call 911 and his response was how fast do you think they can get here? And when he said that, he made a motion and showed me a black handgun in his waistband." *See* 1 Sentencing Tr. (Doc. 26-8) at 65:12–66:14. Peterson then entered Eayrs' house. Eayrs said, "There was some yelling and some screaming, arguing, and then he took her by the arm and he dragged her out the front door." *Id.* at 66:16–67:2. Eayrs did not call 911. On previous occasions, she said, she had seen Peterson abuse Portner verbally and emotionally but not physically. Before the early October incident, she had never seen Peterson with a gun. *See id.* at 68:1–69:14.

A few days after the October 17 incident underlying the criminal charges, an officer observed and photographed bruising on Portner's left temple, her upper arms and wrists, thighs, and her left upper back and shoulder. Portner also had a perforated eardrum and a concussion. *See* 1 Sentencing Tr. (Doc. 26-8) at 29:22–32:13, 43:21–43:24; State's Sentencing Exs. (Doc. 26-10) at 8–23; State's Sentencing Exs. (Doc. 27-2) at 1–2 (filed under seal).

The State located a woman in Arizona who would testify to three incidents of Peterson's pursuit and physical abuse of her. *See* 1 Sentencing Tr. (Doc. 26-8) at 75:1–100:6. It also found a police officer familiar with Peterson's statements and behavior on those occasions and with respect to his assaults on two other

9

women.  All three of the Arizona women were current or former marital or dating partners of Peterson.  Some incidents involved threats by Peterson to kill himself or to shoot at officers or provoke officers to shoot him.  *Id*. at 102:7–116:13.

Peterson pursued a "good Samaritan" defense.  He asserted that he went to Portner's home on October 17 because she had told him she ingested her entire bottle of lithium with the intention of killing herself.  In a pretrial interview with the defense, Portner agreed that when Peterson kicked in her door, he immediately asked where the lithium was.  She also agreed he tried to make her drink water while she was with him that morning.  *See* 2 Sentencing Tr. (Doc. 26-9) at 17:9–17:14, 20:21–21:7.[3]  According to Peterson, he did that because he had researched the issue on the internet before going to Portner's house and determined it would delay or counteract the effects of a lithium overdose.  He said he did not call 911 because he did not believe his call would be taken seriously.  (He did, however,

---

[3] Portner also said the lithium was working for her.  *See* 2 Sentencing Tr. (Doc. 26-9) at 24:2–24:6.

Peterson testified at sentencing that he believed that by ingesting lithium, Portner "had already pulled the trigger on a gun, only it was just a very slow acting bullet." *Id.* at 80:18–23.  He believed her death would be "painful." *Id.* at 81:1–7.  He said that "part of my reasoning" for "want[ing] to die" was "the day prior to that when [Portner] had broken up my only happiness I had going on" by causing Peterson's new girlfriend to break up with him.  Peterson said Portner "made sure that she destroyed that [happiness] that day." *See id.* at 79:14–79:25.  He said he "intended to kill [him]self," *id.* at 91:4–91:7, and "never took a gun out" of the locked gun case and "didn't have a pistol" throughout the 18-hour standoff, *see id.* at 86:19–87:23, and also sent a text stating he would "put the guns away" before he left the house, *see* 1 Sentencing Tr. (Doc. 26-8) at 49:11–54:11.

Again, the point here is not to determine the truth but merely to show that a reasonable juror might interpret the evidence differently than Peterson does.

10

phone and leave a message for a friend of Portner's, using words to the effect of
"something odd is going on and I'm scared for her [Portner], you need to check on
her." *See* 2 Sentencing Tr. (Doc. 26-9) at 25:8–25:22; *see also* 10/17/2008 Report
(Doc. 27-6) at 614–15 (filed under seal)).  He explained his failure to take Portner
to an emergency room by averring that, while he and Portner were in the truck,
they decided to commit suicide together.  *See, e.g.*, 2 Sentencing Tr. (Doc. 26-9) at
54:17–116:15; *see also id*. at 131:17–132:22.

### C.  Peterson's Claim of Actual Innocence

Peterson points to evidence not developed in the criminal case.  He asserts
that this evidence, viewed together with the evidence described above, shows that
he did not commit four of the six crimes underlying his current custody.

This evidence consists of a forensic expert's opinion that a contusion on
Portner's left forehead and temple was likely inflicted after the incident involving
Peterson;[4] cell phone records indicating that Peterson and Portner were 40 miles
away from Portner's house when an officer arrived and knocked on the door;
information that Portner suffered an injury to her left ear as a child, thereby
suggesting that Peterson was not responsible for the perforation of her eardrum;

---

[4]  Peterson also has an affidavit, made in 2018, containing a statement that Portner said in
2010 that she exaggerated her injuries by hitting herself with a baseball bat.  It could potentially
be admitted as a prior inconsistent statement.  *See* Mont. R. Evid. 801(d)(1)(A).  That does not
mean a reasonable juror would be required to believe it was a truthful statement.

and Portner's "general lack of credibility." *See, e.g.*, Pet'r Reply (Doc. 80) at 6–7.

### D.  Analysis

The State charged Peterson with the following offenses:

1.      Aggravated burglary, a violation of Mont. Code Ann. § 45-6-204(1) and (2)(b);

2.      Aggravated kidnapping, a violation of Mont. Code Ann. § 45-5-303(1)(c) (2007);

3.      Aggravated assault, a violation of Mont. Code Ann. § 45-5-202(1);

4.      Assault with a weapon, a violation of Mont. Code Ann. § 45-5-213(1)(b);

5.      Intimidation, a violation of Mont. Code Ann. § 45-5-203(1)(a); and

6.      Partner or family member assault, a violation of Mont. Code Ann. § 45-5-206(1)(a), (c), and (2)(b).

Peterson does not claim he is actually innocent of intimidation or partner or family member assault.  The first four offenses are considered here.

### 1.  Aggravated Burglary and Aggravated Kidnapping

Peterson was convicted of aggravated burglary, that is, knowingly and unlawfully entering or remaining in an occupied structure with the purpose to assault Portner and, in committing the assault, purposely or knowingly causing her bodily injury.  *See* Information at 3; Mont. Code Ann. § 45-6-204(1), (2)(b)

(2007).[5]

Peterson was also convicted of aggravated kidnapping, that is, purposely or knowingly restraining Portner, without lawful authority, by holding her in a place of isolation or by using or threatening to use physical force, with the purpose to inflict bodily injury or terrorize her.  *See* Information (Doc. 34-2) at 2; Mont. Code Ann. § 45-5-303(1)(c).

Under Montana law, "bodily injury" means "physical pain . . . or an impairment of physical condition."  Mont. Code Ann. § 45-2-101(5) (2007).

Peterson contests the purpose of his entry into Portner's home, as he claims he acted to save her from the effects of a lithium overdose.  At sentencing, he testified to his account of what happened and his account of the meaning of text messages exchanged between him and Portner.  *See, e.g.*, 2 Sentencing Tr. (Doc. 26-9) at 76:17–81:7.  But, at sentencing, Deputy Pease testified that he stopped by Portner's home because someone had requested a welfare check.  He noted the doorjamb was broken, but he found no one at home.  Later, he responded to Janet's 911 call and spoke with Portner at the church.  She told him that Peterson kicked in the door, beat, slapped, and kicked her, seized her hair to drag her out of her house

---

[5]  The 2007 version of the Montana Code Annotated applies to all four offenses.  The definition of aggravated burglary is slightly but immaterially different now than it was in 2007.  Other than amendment to use gender-neutral language, the definitions of the other three offenses have not changed.

and into his truck, and slammed her head into part of the truck's interior.  Pease also said Portner told him Peterson hit her in the back of the head with a gun.  *See* Sentencing Tr. (Doc. 26-8) at 24:17–25:14, 26:6–13.  Detective Potter testified that a doctor had told him that Portner's CT scan indicated abnormalities consistent with trauma.  *See id*. at 44:6–19.

This evidence establishes each element of both aggravated burglary and aggravated kidnapping, and it is not conclusively negated by Peterson's evidence. A reasonable juror might not be convinced beyond reasonable doubt by Portner's account of what happened.  But Peterson must point to evidence sufficient to show that *no* reasonable juror would be persuaded beyond reasonable doubt that he committed aggravated burglary and aggravated kidnapping.  He does not meet the standard.

### 2.  Aggravated Assault

Peterson was convicted of either purposely or knowingly causing Portner serious bodily injury, or using physical force or contact to cause her reasonable apprehension of serious bodily injury.  *See* Information at 2–3; Mont. Code Ann. § 45-5-202(1).

As to this charge, Peterson contests the element of serious bodily injury. Under Montana law, "serious bodily injury" includes injury that "causes serious permanent disfigurement or protracted loss or impairment of the function or

14

process of a bodily member or organ," or, "at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ."  Mont. Code Ann. § 45-2-101(66)(a)(ii), (iii).

When Portner was a child, she twice had ear surgery.  Her parents believed her left ear was impaired.  Before the incident with Peterson, Portner was able to hear only low tones in her left ear.  *See* Buzzell Aff. at 1–2 (Doc. 56-3 at 25–26).

At sentencing, Detective Potter testified that a doctor found that Portner's left eardrum had previously been reconstructed, but the reconstructed eardrum was perforated.  *See* 1 Sentencing Tr. (Doc. 26-8) at 43:13–44:5; *see also* Reply (Doc. 80) at 6 n.3.  Although Portner was not subjected to cross-examination at sentencing, she read a statement asserting that she was "deaf in one ear from being repeatedly hit in the head."  She also testified that she was "[p]hysically . . . still healing," a year after the incident.  She had been told her "neck and shoulder and tissue damage . . . may never entirely heal," and "[m]ore than likely there will always be some pain and discomfort."  1 Sentencing Tr. at 153:17–21.

This evidence shows "a protracted loss or impairment" in bodily function and meets the element of serious bodily injury.  *See, e.g.*, *Adams v. State*, 153 P.3d 601, 609–10 ¶ 41 (Mont. 2007); *State v. Houle*, 966 P.2d 147, 149 ¶¶ 11–16 (Mont. 1998).  Neither the background provided by Portner's parents nor the forensic

15

expert's opinion, nor both together, negate the evidence that Peterson inflicted serious injury. He contends that a juror who did not believe Portner's testimony would not convict him. *See* Reply (Doc. 80) at 7 (quoting and citing Prop. Am. Pet (Doc. 70-1) at 35–38). That is certainly true, but it is not the same thing as pointing to evidence that would persuade *all* reasonable jurors that she did not suffer serious bodily injury. Peterson fails to show that no reasonable juror would find him guilty of aggravated assault.

### 3. Assault with a Weapon

Peterson was convicted of purposely or knowingly causing Portner reasonable apprehension of serious bodily injury by use of a handgun. *See* Information at 3; Mont. Code Ann. § 45-5-213(1)(b).

Portner said, apparently in a written statement prepared three days after the incident, that a deputy came to the door of Peterson's home while Peterson was holding her there. When the deputy knocked, Peterson pointed a handgun in her face and told her to be quiet. A handgun was never found.

In a supplemental report dated February 26, 2009, Deputy Zae Hudson stated that he knocked on the door of Peterson's home at about 11:45 a.m. Hudson was looking for Portner, as Deputy Pease was doing when he discovered the broken doorjamb at Portner's house. Hudson also reported that he made unanswered calls to Peterson and Portner's phones. *See, e.g.*, Aff. in Supp. of

16

Information (Doc. 34-1) at 3–4; Case Report at 7–8 (Doc. 27-6 at 649–50); Pet'r Ex. D (Doc. 56-3 at 28, 60); Pet'r Ex. BL (Doc. 29-4 at 6).

Peterson takes issue with the time of the deputy's visit, asserting that he and Portner could not have been at his house at 11:45. The argument is "based on Portner's description of where they went and where they were when certain events occurred," "juxtapose[d] . . . with phone data and police reports showing times." Peterson Ex. D at 1 para. 1 (Doc. 56-3 at 28).

A reasonable juror might decide that the State did not prove this charge beyond reasonable doubt. But Peterson's analysis depends on the accuracy of Portner's account of where she and Peterson went and their speed of travel, as well as the accuracy of Hudson's report. Witnesses, including victims, are frequently imprecise and inaccurate about times and distances. This is one of the reasons some defendants choose to stand trial. Even if Peterson proved Portner's description of events was not consistent with hearing a deputy knock on Peterson's door at 11:45 a.m., a reasonable juror could still believe that Portner was telling the truth about what happened. Portner knew a deputy knocked on the door, and a deputy did so. In addition, about two weeks before the incident, Eayrs saw a black handgun in Peterson's waistband when he appeared in front of her house, uninvited, showed Eayrs the gun, and took Portner away with him. Portner's

account of Peterson's threat aligned with Eayrs' testimony, with the other events Portner reported, and with the manner in which the whole incident came to light.

Despite Peterson's evidence, a reasonable juror could still believe, beyond reasonable doubt, that Portner and Peterson were at his house when the deputy knocked, and Peterson pointed a gun in her face. Peterson fails to show that no reasonable juror would find him guilty of assault with a weapon.

### E. Conclusion

Peterson does not show that he is actually innocent of any of the crimes to which he pled guilty. Consequently, except for the claim of judicial bias, all claims in his original and amended petition are time-barred. To the extent leave to amend is required, it is denied.

### III. Judicial Bias Claim and Motion for Discovery

In a habeas case, discovery is permitted if the petitioner makes "specific allegations" showing "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (explaining Rule 6 of the Rules Governing § 2254 Cases).

Peterson was convicted and sentenced in 2009. His motion to withdraw his guilty pleas was denied on December 14, 2011. *See* Order (Doc. 26-27). His petition for postconviction relief was denied on December 3, 2015. *See* Order

18

(Doc. 26-68).  Judge Jeffrey Langton presided in all these proceedings.

In October 2017, Kim French and Lisa Farmer swore out affidavits stating that they heard Portner claim that, in 2009, she had a sexual relationship with Judge Langton and used cocaine with him.  In December 2018, Robert Farmer swore out an affidavit containing the same allegation.  Peterson points to these affidavits to assert that Judge Langton was biased against him and should have recused himself.

These allegations were initially aired—literally—in an attorney's unsuccessful election campaign to unseat Judge Langton.  At a hearing before the Montana Commission on Practice, Judge Langton and Portner both denied the allegations.  Each said they met at a Christmas party in 2012.  Peterson fails to point to anything suggesting the attorney had an iota of evidence to support his febrile allegations.

The affidavits Peterson submits postdate the Commission on Practice hearing.  Peterson attempts to take Portner's testimony at the hearing as his starting point, apparently in the hope of working his way back to the original allegation of bias requiring recusal.  French and Lisa Farmer aver that they exchanged Facebook messages with Heather Portner in 2016 while she was using her maiden name, "Warila."  Some of these messages purport to express personal knowledge of "Jeff," that is, Judge Langton.  At the hearing, Portner, under oath, denied

19

authorship of the messages and said she never used her maiden name on Facebook.[6]  Peterson seeks leave to depose French and Farmer and to issue a subpoena to Meta Platforms in order to find out whether Portner ever used the name Warila and whether she posted the messages of July and September 2016. *See* Supp. Ex. (Doc. 16-1) at 107–129, 131; Pet'r Mot. for Discovery (Doc. 71) at 5–6.  He claims that the fruits of this subpoena would be "directly relevant to Peterson's judicial bias claim."  Pet'r Mot. for Discovery at 12.

Whatever the correct word might be, it is not "directly."  Peterson reasons that if he can show Portner erred or lied about using the name "Warila" on Facebook and posting the 2016 messages, then she is more likely to have had a scandalous relationship with Judge Langton in 2009.  The conclusion does not follow the premise.  Deposing Kim French and Lisa Farmer is not likely to lead to competent evidence that Judge Langton should have recused himself in 2009.  If Peterson proved that Portner herself actually *said* what the affiants say she said— and he does not explain how he could do even that—he suggests no reason to believe any competent evidence supports his assumption that Portner actually *did* what French and the Farmers claim she *said* she did.

---

[6]  In her affidavit, Farmer claims Portner "slipp[ed] up" when, looking at the messages, she said she had not used her maiden name "even at that time."  Farmer takes the phase to indicate that Portner recognized the messages.  *See* Farmer Aff. ¶¶ 14–15 (Doc. 16-1 at 93). That is one way to look at it.  The phrase could just as well refer to the time at which Portner was using the outdated profile picture that was displayed with the messages.

As the Court previously explained, *see* Order (Doc. 67) at 3–7, Peterson must point to some evidence supporting a reasonable inference that, in 2008 or 2009, Portner had a relationship with the Judge that required him to recuse himself. Depositions and a complete and detailed response to the subpoena would leave the allegation right where it is now—wholly lacking factual support.  Peterson fails to show "good cause" to depose French or Farmer or to issue a subpoena to Meta Platforms.  *See* Rule 6(a), (b), Rules Governing § 2254 Cases.  His discovery requests are denied.

The Court recognizes that Judge Langton testified he met Portner late in 2012.  That was after the conclusion of the criminal case and after he denied Peterson's motion to withdraw his guilty pleas.  But after he met Portner, Judge Langton presided over Peterson's petition for postconviction relief.[7]  Especially in Montana, acquaintanceship is a routine fact of life that requires judges to consider whether they are able to preside without bias or the appearance of impropriety. Assuming, arguendo, that a viable federal habeas due process claim could arise from state collateral review, Peterson alleges no reason to believe Judge Langton should have recused himself from the proceedings on the state postconviction

---

[7]  The Montana Supreme Court affirmed Judge Langton's decision, but it held that Peterson's claims were time-barred.  *See* Order (Doc. 26-85).  Judge Langton had found they were not time-barred but lacked merit.

petition.

Peterson's claim of judicial bias is denied for lack of merit.

## IV.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Gonzalez v. Thaler*, 565 U.S. 134, 140 (2012) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.* at 140–41 (quoting *Slack*, 529 U.S. at 484).

Peterson argues that all of his claims should be considered because he is actually innocent.  The evidence he produces, however, indicates at most that some reasonable jurors might not find him guilty beyond reasonable doubt.  He does not show that *no* reasonable juror would convict him.  Reasonable jurists would find no room to debate this outcome.

22

The sole claim that is not time-barred is Peterson's claim that Judge Langton should have recused himself in 2009. The claim has no substance supporting it, only hearsay. Peterson asks leave to depose the witnesses who speak the hearsay. He also requests leave to subpoena subscriber information from Meta Platforms in an attempt to show that a witness erred or lied about Facebook posts she allegedly made in 2016. The discovery he requests would not bring him a single step closer to substantiating his claim that Judge Langton had a duty to recuse himself in 2009. Even if a petitioner need not have as much support for his allegations as the petitioner in *Bracy v. Gramley*, 520 U.S. 899 (1997), he must have something. *See* Order (Doc. 67) at 6–7. Reasonable jurists would not find even rudimentary support here. Room to debate the outcome does not exist.

A COA is not warranted and will be denied.

Accordingly, IT IS ORDERED:

1. Peterson's motions to amend the petition and to conduct discovery (Docs. 70, 71) are DENIED.

2. Peterson's claim of judicial bias is DENIED for lack of merit.

3. All other claims are DISMISSED WITH PREJUDICE as time-barred without excuse.

4. The clerk shall enter, by separate document, judgment in favor of

Respondents and against Petitioner Peterson.

5.  A certificate of appealability is DENIED.  If Peterson files a notice of appeal, the clerk shall immediately process the appeal.

DATED this 18th day of August, 2022.

Dana L. Christensen, District Judge
United States District Court